UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARCUS R. CORCHADO

Petitioner,

-vs-

**No. 04-CV-0039(VEB)**
**DECISION AND ORDER**

SUPT. MICHAEL RABIDEAU,

Respondent.

## I.     Introduction

Marcus R. Corchado ("Corchado" or "petitioner"), represented by retained counsel

Nelson S. Torre, Esq., seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the basis of

alleged constitutional infirmities in the judgment of conviction entered against him on October 1,

1998, on charges of second degree manslaughter and third degree criminal possession of a

weapon. The parties have consented to disposition of this matter by a magistrate judge pursuant

to 28 U.S.C. § 636(c)(1).

## II.     Factual Background and Procedural History

### A.     Overview

Corchado was indicted on two counts of Murder in the Second Degree (New York Penal

Law ("P.L.") §125.25(1), (2)), one count of Criminal Possession of a Weapon in the Second

Degree, an armed felony (P.L. §265.03), one count of Criminal Possession of a Weapon in the

Third Degree, an armed felony (P.L. §265.02(4)), and one count of Prohibited Use of Weapons,

an armed felony (P.L.§265.35(2)). The charges stemmed from Corchado's alleged involvement

in the shooting death of Mark Kosmoski ("Kosmoski" or "the victim") in the City of Buffalo on

1

July 28, 1997.

### B.   The Shooting

The following factual summary has been gleaned from trial minutes, as well as petitioner's appellate brief and the prosecution's appellate brief.  In the early morning hours of July 28, 1997, Kosmoski and five of his friends had left a party at a friend's house which had begun the night before. Kosmoski was the backseat passenger in his friend Frank Militello's Ford Bronco. Also present in the car were their friends Sean Farrar ("Farrar"), Ryan Murray ("Murray"), Michael Wagner ("Wagner").  They were following the sixth friend, Justin Pawlowski ("Pawlowski"), who was riding his bicycle home. After he dropped his bike, Pawlowski got into the hatch of the truck. Militello was going to drive them to the area where he previously had lived, near the Langfield Projects. Farrar previously had discussed going to another house to "get into a fight" but no one was one, so Militello continued to drive them around.

As the vehicle turned onto Edison Street, they passed a young black male they later identified as Corchado, who was walking on the street. R.531, 623, 790-91, 855-56, 977-78.[1] This man was wearing baggy shorts, a white undershirt beneath a black-and-white checkered shirt, and was carrying a school bag. Corchado and the young men in the Ford Bronco did not know each other; the shooting apparently was precipitated by the exchange of dirty looks between Farrar, the front-seat passenger, and Corchado, who was walking on the sidewalk. Farrar admitted that he was looking to get into a fight that night. He claimed that Corchado was giving him an angry look, and said, "What." Farrar shouted, "What, motherfucker?" back at him.

---

[1]     Citations to "R.__" refer to pages of the record submitted in connections with petitioner's direct appeal of his conviction.

R.162-63, 533, 626, 979. Corchado shouted something back. R.535, 626-27, 979-80. Militello

stopped the truck, and Farrar exited with the words, "I am going to get out and fight him."

R.535, 556, 628, 860, 980-981. Militello said that he stopped the car because when Corchado

"yelled something back we were probably going to get out and beat him up or whatever we were

going to do to him."

     According to Farrar, while he was standing in the street, Corchado yelled, "What, you

want my money?". R.536, 791, 862. Corchado pulled out what appeared to be a gun and moved

toward him. While standing in the street, Farrar stated that petitioner began to run at him.

R.536-37, 539, 630-31, 792-93, 795, 863, 982-83. Wagner also testified that he observed the

individual pull a gun out from behind his back and point it at the vehicle while holding it in a

tilted manner. Farrar heard Murray, who was still in the truck, state, "he's reaching for

something...[h]e's got something in his hand . . . he's got a gun." R.168.  Farrar stated Corchado

brought his left hand up, and he observed what appeared to be a gun pointed at him. At that

point, Farrar leapt back into the vehicle and told Militello to get out of there.

     As the Bronco was driving away, two or three shots rang out. After hearing a window

break, Murray heard Kosmoski announce that he had been hit.. R.540-41, 631-33, 799, 864-65,

985-986. Within five to ten minutes of the shooting, the victim and his friends arrived at an

emergency room. R.543, 637, 799-800, 867.  Kosmoski was unable to be saved; the bullet had

pierced several of his vital organs. R.542, 633, 799, 865, 987.

     About ten to twenty minutes after that, the police arrived, R.545, 638, 800, 990. Officer

Czekalski, who initially interviewed the witnesses, testified that Farrar, the front-seat passenger,

described the shooter as a "black male in his twenties, . . . light-skinned, . . . wearing a black and

white checkered shirt, shorts, and he had a Jans Sport [sic] book bag . . . ." R.22. Other witnesses

described the shooter as a  "light-skinned" "skinny" black male, about six-feet-tall, with a "little

bit of facial hair."  This description--"light-skinned black male with a hat on, [and wearing]

black and white checkered short-sleeved shirt, blue-jean shorts[.]" R.639, 801, 869– was

broadcast over the police radio at about 3:15 a.m. Lieutenant Doyle, who had arrived shortly

thereafter to conduct the show-up identification, directed that the five witnesses be separated

from each other so that they would not continue to talk amongst themselves.

     Officers Hosking and White who were on patrol located a person appearing to match the

description (i.e., Corchado) in the vicinity of Edison and Langfield, the approximate location

where the shooting had occurred. R.714-15, 977-78. Corchado was walking with a friend of his,

Adrian Harrison ("Harrison").[2]  Officers Hosking and White arrived with Corchado about five to

six minutes after the broadcast.

     In the meantime, medical personnel in the emergency room had informed the victim's

friends that he had died. Officer Czekalski related that "[a]ll chaos broke out in the . . . ER when

the young lady came out from the trauma room and announced that he was gone, that he'd died."

R.20. One man "start[ed] bashing his hands against the mirrors" in the men's room and another

one "was pounding the walls." R.20-21. She "had to call for other cars to come up there to assist

us." R.21.

### C.    The Show-Up Procedure

     When the officers arrived with Corchado in the patrol car, the show-up procedure was

conducted at the hospital. It was about 3:30 a.m., within a half hour of the victim's arrival at the

---

[2]    Harrison was never implicated in the shooting. He testified for the defense at Corchado's trial.

hospital. R.547, 640, 801, 869, 991. According to the officers present, only "[t]wo of the individuals [i.e., Farrar and Pawlowski] had stated they possibly could identify the suspect." R.55-56. The other three individuals [i.e., Militello, Murray and Wagner] said they "were unsure whether they would be able to identify him." R.56, 57.

Lieutenant Doyle advised Officers Hosking and White that he did not want the suspect handcuffed. Corchado was asked to step out of the vehicle and stand next to the car. Corchado was flanked by two uniformed officers. Each of the victim's friends viewed petitioner separately. R.547, 801, 869, 991. Lieutenant Doyle brought out each witness one at a time. He told them that they were going to look at an individual "who was a suspect, it may be the person, it may not be the person." He told them, "If it is, to let me know; if it isn't to let me know; if they're not sure, to let me know." R.71. Corchado was about four to five feet away from the police car during each separate viewing. R.72. The witnesses were within six to ten feet from where Corchado was standing. The lighting conditions outside the hospital were "excellent".

Farrar was the first individual to view the show-up, at 3:28 a.m. He "said nothing to [Doyle]" and was "very emotional" at the time. R.74. As he saw Corchado, he said "No." R.76. Farrar then "looked at the suspect for probably twenty-five seconds," at which time he said, "Make him say something . . . Make him say, 'Where's your fuckin' money?'" Corchado said it "in a very low, monotone voice" and was asked to repeat it a little louder, "at which point he raised his voice a little bit." R.76. Doyle asked him, "Is it the person?" And Farrar said, "No," and walked back into the hospital. R.77. Lieutenant Doyle observed that Farrar had been drinking. R.83. Farrar remarked that Corchado was wearing the same clothes as the shooter and also had the same thick eyebrows. R.548.

5

Militello was the next individual; he viewed Corchado at 3:31 a.m. Militello said, "I'm not sure but that looks like the clothing he was wearing." R.78. He viewed Corchado for about twenty seconds. Militello was very quiet; he also had a "strong odor of alcohol" about him. R.79. Although he initially told the police, "that's the kid. He's got the same clothes on," he subsequently said, "I'm not sure." He claimed that he hesitated because he believed the police were going to show him more suspects. R.642-43.

Pawlowski, who had been riding in the hatch of the truck, was next. Doyle recalled that Pawlowski looked at Corchado and simply said, "Yes." He did not say anything else before he put his head down and walked back into the hospital. (When Pawlowski was later brought to the police station to give a statement, he essentially retracted his identification at the show-up, telling police that he had identified Corchado based not on his face but on the clothing he was wearing.)

Murray was the fourth individual. He "was very quiet" and he "also had a strong odor of alcohol on his breath." R.81. He looked at Corchado for about twenty to twenty-five seconds, and he said, "No." R.81. And he put his head down and Doyle walked him back inside. R.83. Murray did say that end "looked at [petitioner] real quick and said that those were the clothes that [the shooter] was wearing." R.871.

The fifth and last friend, Wagner, said that petitioner was wearing "the same clothes that the guy that shot us was wearing." R.992.  After about twenty or twenty-five seconds, Wagner said to Doyle, "'I'm not sure but those are the clothes he was wearing.'" R.82. Wagner also "was under the influence of an alcoholic beverage." R.82. Doyle testified that all of the witnesses were able to follow his instructions and were able to speak, despite their intoxication.

6

D.       **The Physical Evidence**

Based largely on several of the witnesses having identified the shooter based on his apparel, the police also obtained a search warrant for Corchado's clothing. R.924. The items were taken from petitioner's person on the morning of the shooting and then sent for gunshot residue testing. R.920-25. The tests came back with positive results, R.1206, 1219-1221, indicating the presence of gunshot residue particles on the waistband of Corchado's shorts and hem of his t-shirt. In particular, Alfred Schwoeble testified as a ballistics expert that he found one particle unique to gunshot residue and two particles characteristic of gunshot residue on the left side of Corchado's shirt. R.1206. He found at least one particle unique to gunshot residue on each of the items of clothing that he tested. He stated the gunshot residue particles could be deposited onto a person's clothing if that person had discharged the weapon or was in close proximity of a weapon being discharged. He conceded that they could be deposited onto clothing by coming into contact with a contaminated surface. Although the gunshot residue kits allowed one to test  the suspect's skin, Detective Streicher did not swab Corchado's hands, skin or arms to determine the presence of gunshot residue. R.1128.

E.       **The Line-Up Procedure**

On November 26, 1997, Corchado was indicted by an Erie County grand jury. The prosecutor subsequently sought an order to show cause to have Corchado stand in a line-up, noting that one witness (Militello) had affirmatively identified Corchado at the show-up based on his facial features but then had become "tentative" because he believed that the police were going to show him more suspects. Defense counsel objected on several grounds, arguing that any identification at a line-up at this time would be based on the witnesses' memory of Corchado

from the show-up procedure conducted at the hospital.

The trial court granted the prosecutor's application and, on December 23, 1997, approximately five months after the show-up, the line-up was held. R.189-190. The witnesses and Corchado and the line-up fillers were kept at different locations at the police sation until the line-up began to prevent any possible contact between the two groups. R.190. During the line-up, the witnesses were seated separately and apart from one another in the observation room. R.192. They were instructed not to communicate with each other.  Petitioner was then presented in a two-phase lineup with four stand-ins. R.191, 196. In the first phase of the line-up, petitioner chose to be in position number four. Three witnesses–Farrar, Murray, and Wagner–made positive identifications in the first line-up. R.201. The two line-ups occurred about eight minutes apart. R.203. The places of the stand-ins and Corchado were changed in the second line-up, during which he selected the second position. R.197. R.201, 204, 555-56, 647-50, 806-10, 873-77, 1004-1005. In the second phase, one more individual, Pawlowski, also identified Corchado. R.205. At trial, these same four friends identified Corchado from the witness stand. R.541, 635, 810-11, 878-79.

After a hearing, the trial court subsequently denied Corchado's request to suppress the line-up identifications.

**F.     The Jury Verdict**

The trial court jury charged the jury regarding the offenses as set forth in the indictment against Corchado: In addition, the jury was told that it could consider the lesser included offense of second degree manslaughter. The jury returned a verdict convicting Corchado of second degree manslaughter and third degree criminal possession of a weapon.

### G.       The Motion to Set Aside the Verdict

Prior to sentencing, defense counsel moved pursuant to New York Criminal Procedure Law ("C.P.L.") § 330.30 to aside the verdict on the basis of newly discovered evidence–namely, evidence from a woman who had witnessed the crime that an individual named "Tru", whose whereabouts were unknown, had been the shooter. *See* R.1784-99, 1801-02.  Specifically, defense counsel was advised by the prosecutor that Elliott had come forward after trial and had advised one of the detectives originally involved in the investigation that she had observed an individual other than Marcus Corchado commit the crimes for which Corchado had been convicted. R.1802. The witness, Christine Elliot, in a statement taken by the Erie County District Attorney's office and during a meeting later held with defense counsel in Elliott's home, explained that she had witnessed the firing of the weapon, and that the person who she saw firing the weapon was not Corchado, but another individual whom she had seen several times before in her neighborhood known to her as "Tru". R.1790-91, 1805-06.

Defense counsel was aware of Elliott's existence prior to trial; during discovery, the District Attorney's office turned over documents indicating that shortly after the incident, which took place on Edison Street, members of the Buffalo Police Department canvassed the area and spoke with different individuals, including Elliot. R.1805. At that time Elliott advised the police that while she heard some noise on the street, she did not observe anything and could provide no information relevant to the investigation. R.1805. Defense counsel had conducted his own pre-trial investigation in the area and spoke with several individuals who lived in and around the area where the incident took place. R.1805. He attempted to interview Elliott at her home twice, but she was not there on either occasion. R.1805.

9

Defense counsel conceded during oral argument on the C.P.L. § 330.30 motion that Elliott was known to him prior to trial, but argued that "it is not that the 'witness' is newly discovered, but it is the fact that since the trial, the witness has, for the first time, made statements which makes such evidence newly discovered." *People v. Stokes*, 83 A.D.2d 968, 443 N.Y.S.2d 12, 14 (App. Div. 2d Dept. 1981). Defense counsel argued that Elliot's evidence was "newly discovered" since she did not make any statements concerning her knowledge that the real shooter was a person named "Tru" and not Corchado, until after trial. R.1801-02 Until that time, defense counsel stated, Elliott remained reluctant to come forward with her evidence, due to her fear of retaliation and her involvement as a witness in another homicide investigation. R.1807.

As discussed more fully *infra*, the trial court denied the motion and proceeded to the sentencing phase. Corchado was sentenced to concurrent prison terms of five to fifteen years for the manslaughter conviction and one to five years for weapons possession conviction.

## H.     The Direct Appeal

The Appellate Division, Fourth Department, of New York State Supreme Court, unanimously affirmed the judgment of conviction in a memorandum decision and order entered November 15, 2002. *People v. Corchado*, 299 A.D.2d 843 (App. Div. 4th Dept. 2002). Leave to appeal to the Court of Appeals was summarily denied. *People v. Corchado*, 99 N.Y.2d 581 (N.Y. 2003). Corchado did not file any other applications for post-conviction relief in state court before he filed his petition for a federal writ of habeas corpus (Docket No.1).

## I.     The Federal Habeas Petition

Corchado asserts that the identification evidence was improperly obtained as a result of

suggestive procedures and should have been suppressed, that the trial court admitted hearsay evidence in violation of his Sixth Amendment right to confrontation, that the trial court erroneously denied his C.P.L. § 330.30 motion without an evidentiary hearing, and that the search warrant was improperly obtained. Respondent has opposed the petition on procedural grounds as well as on the merits.

For the reasons set forth below, I conclude that the petition does not warrant issuance of the writ.

## III.    Analysis of the Petition

### A.    Ground One: The trial court erroneously denied his motion to set aside the verdict on the basis of newly discovered evidence without a hearing.

As his first ground for habeas relief, Corchado asserts that the trial court committed a "Due Process and Sixth Amendment violation" by declining to hold a hearing regarding a claim of newly discovered evidence of his innocence. Petition ("Pet."), ¶22(A) (Docket No. 1). According to Corchado, after trial and before sentencing, "an eyewitness told police it was someone else and not defendant who shot the victim" but "[t]he motion for hearing on newly discovered evidence was denied." *Id.*

As discussed above, the new evidence came from Christine Elliott, who initially denied knowing anything about the shooting but, after trial, has submitted a sworn statement to the District Attorney's Office in which she claimed that the "real" shooter was a black male from New Jersey named "Tru" whose whereabouts were unknown to her. The trial court did not find this evidence persuasive, and denied petitioner's motion to set aside the verdict, *see* R.1834-39, without a hearing. The judge ruled that the sworn statement of the alleged new witness was "totally inconsistent with [the evidence] which was developed during the course of a lengthy

trial." R.1837. The trial court noted that the testimony established that at the time of the

shooting, the perpetrator was wearing sneakers, a black and white checked shirt, a white

undershirt, and was carrying and a book bag. R.1837. Corchado was apprehended wearing

clothing that matched the description of the shooter's apparel given by the other eyewitnesses.

According to Elliott's "newly discovered evidence," the person who really had done the shooting

("Tru"), was "wearing black pants, a red sweatshirt, a dark book bag, a skully [sic], [and]

Timberland tan-colored boots" R.1834-1835. The trial judge found the allegedly new evidence to

be merely inconsistent with the testimony the jury had heard at trial. R.1835-1836. The trial

judge commented, "I can't believe that somebody [i.e., Elliott], who denied having any

knowledge of the fact[s], who came [sic] to the jury at the last minute with such descriptions

inconsistent with trial proof, would have constituted [sic] a more favorable verdict of acquittal of

the defendant." R.1836.

On direct appeal, the Appellate Division affirmed the trial court's denial of the motion to

set aside the verdict, stating that "[t]he court properly determined that the testimony submitted

by

defendant in support of that motion was not 'of such character as to create a probability that had

such evidence been received at the trial the verdict would have been more favorable to the

defendant.'" *People v. Corchado*, 299 A.D.2d at 844 (quoting N.Y. CRIM. PROC. LAW §

330.30(3); other citations omitted). Therefore, the Appellate Division held, the trial court

properly denied Corchado's motion without a hearing. *Id.* (citations omitted).

To the extent that the allegations supporting the first ground of Corchado's petition relate

to alleged procedural errors in a proceeding collateral to the judgment of conviction, they do not

set forth a constitutional claim cognizable in this federal habeas proceeding. The law is clear that 28 U.S.C. § 2254 affords habeas corpus relief to "a person in custody pursuant to the judgment of a State court [who] is in custody in violation of the Constitution or laws . . . *of the United States*." *Id.* § 2254(a) (emphasis supplied). Furthermore, relief under § 2254 is available for violations of federal law leading to a criminal conviction in state court or on direct appeal from a conviction, but not for violations which occur on collateral review. *See*, *e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. . . . Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings. . . .").

Thus, procedural errors in post-conviction proceedings in state court–such as the trial court's alleged error in declining to hold a hearing on the C.P.L. § 330.30 motion—generally are not cognizable on federal habeas review.  The rationale behind this is that a claim regarding an infirmity in a state post-conviction proceedings "is collateral to appellant's conviction and detention, and is therefore not cognizable in a 28 U.S.C. § 2254 petition." *Williams-Bey v. Trickey*, 894 F.2d 314, 317 (8th Cir.), *cert. denied*, 495 U.S. 936 (1990).  As a number of district courts in this Circuits have observed, "[a]ll the circuits that have considered the issue, except one, have held that 'federal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings.'" *Guzman v. Couture*, 99CIV11316(RMB)(HBP), 2003 WL 165746, at *13 (S.D.N.Y. Jan. 22, 2003) (citing *Franza v. Stinson*, 58 F. Supp.2d 124, 151 (S.D.N.Y.1999) (quoting *Ortiz v. Stewart*, 149 F.3d 923, 939 (9th Cir. 1998), *cert. denied*, 526

U.S. 1123 (1999)).[3]

Although the Second Circuit has not directly addressed this issue, the district court decisions within the Circuit (several of which have been affirmed by the Second Circuit) have followed the majority rule. *Guzman v. Couture*, (citing *Diaz v. Greiner*, 110 F. Supp.2d 225, 235 (S.D.N.Y.2000) ("Petitioner's unsupported assertion that the trial court denied his (third). [ sic ] CPL § 440.10 motion without a hearing violated due process is not cognizable on federal habeas review."); *Lugo v. Kuhlmann*, 68 F.Supp.2d 347, 376 n. 15 (S.D.N.Y.1999); *Franza v. Stinson*, 58 F .Supp.2d at 152; *Sparman v. Edwards*, 26 F. Supp.2d 450, 468 n. 13 (E.D.N.Y.1997) (stating that "the weight of authority holds that in habeas corpus proceedings federal courts do not have jurisdiction to review state court denials of motions for a new trial"), *aff'd*, 154 F.3d 51 (2d Cir.1998); *Bellamy v. Cogdell*, 802 F. Supp. 760, 772-73 (E.D.N.Y.1991); *Michael v. Dalsheim*, No. CV 90-2959, 1991 WL 99368 at *9 (E.D.N.Y. May 22, 1991); *Turner v. Sullivan*, 661 F. Supp. 535, 540-41 (E.D.N.Y.1987) (claim that trial court violated due process by denying CPL § 440.10 motion without setting out findings, conclusions and its reasoning not cognizable on federal habeas review; "Petitioner has not suggested in what respect the failure to comply with the state rule has violated his federal due process rights. A writ of habeas corpus may not be issued on the basis of a perceived error of state law."), *aff'd*, 842 F.2d 1288 (2d Cir.), *cert. denied*, 487 U.S. 1240 (1988).

---

[3]      *See also Villafuerte v. Stewart,* 111 F.3d 616, 632 n. 7 (9th Cir. 1997) (claim that petitioner was denied due process in state habeas proceeding is "not addressable in a section 2254 proceeding"), *cert. denied*, 522 U.S. 1079 (1998); *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir.) (*per curiam*) ("Unless state collateral review violates some independent constitutional right, such as the Equal Protection Clause, . . . errors in state collateral review cannot form the basis for federal habeas corpus relief."), *cert. denied*, 519 U.S. 907 (1996); *Jenkins v. Houston*, No. 4:05CV3099, 2006 WL 126632, at *1 (D. Neb. Jan. 17, 2006) ("The petitioner's second and third § 2254 claims, based on defects in his state postconviction proceedings, must be dismissed. Errors during state postconviction review and claims based on ineffective assistance of counsel and other constitutional deprivations during state postconviction proceedings are not cognizable in a federal habeas corpus action.") (citations omitted)

The Court finds no reason to deviate from the majority view in this case. Thus, to the extent that Corchado claims entitlement to habeas relief on the basis that the trial court failed to hold an evidentiary hearing with regard to his post-verdict C.P.L. § 330.30 motion, that claim is denied on the basis that it is not cognizable on habeas review.

The second aspect of Corchado's first ground for relief, i.e., the underlying newly discovered evidence claim, similarly does not assert a cognizable habeas claim.  "A claim 'based on newly discovered evidence ha[s] never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.'" *Ortega v. Duncan*,  333 F.3d 102, 108 (2d Cir. 2003) (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993) (citing *Townsend v. Sain*, 372 U.S. 293, 317 (1963), for the proposition that evidence that could not have been presented in the state proceedings "must bear upon the constitutionality of the applicant's detention"). "In order for habeas relief to issue, then, a due process violation must have occurred at [Corchado's] trial." *Id.*

Corchado has not alleged an underlying constitutional violation in connection with the failure of the alleged "new eyewitness" to present her observations about the mysterious individual named "Tru"being the actual shooter. First, there was no failure to disclose exculpatory information–the prosecutor turned over information identifying Elliott as a potential witness prior to trial. Although she had denied any knowledge of the crime to the police, defense counsel nevertheless attempted to speak with her.  However, through no fault of the defense or the prosecution, Elliott refused to make herself available for an interview. I further note that there is no indication that Elliott was prevented from testifying, or that the prosecutor or the police knew or should have known that she purportedly was being untruthful when she stated, at

the time of the incident, that she did not have any relevant information to give.

This Court is unable to grant habeas relief on the claim of newly of newly discovered evidence, given the absence of an independent constitutional violation having occurred in Corchado's criminal proceeding. *See Ortega v. Duncan*, 333 F.3d at 108; *Herrera v. Collins*, 506 U.S. at 400. In light of *Herrera v. Collins*, the Appellate Division's rejection of his claim pertaining to Christine Elliott's allegedly new exculpatory evidence was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

**B.      Ground Two: The pre-trial identification procedures were suggestive and the trial court erroneously failed to conduct a hearing at which petitioner could call witnesses for the defense**

**1.      Overview**

Corchado asserts that his Due Process and Sixth Amendment rights were violated by allegedly suggestive pretrial identification procedures, and by the trial court's failure to permit him to call witnesses at the suppression hearing held pursuant to *United States v. Wade*, 388 U.S. 218 (1967). Pet., ¶22(B) (Docket No. 1). As respondent points out, there were two identification procedures involved in this case: The first was a post-incident show-up at the hospital which failed to produce a positive facial identification; the second, a post-indictment, court-ordered lineup held five months later and which produced a positive facial identification. Respondent asserts that in his brief on direct appeal, petitioner implicitly conceded the validity of the show-up by declining to make any arguments challenging it. Respondent's Memorandum of Law ("Resp't Mem.") (Docket No. 6) (citing Petitioner's Appellate Brief at  42). Instead, petitioner's appellate counsel challenged the validity of the court-ordered lineup, standing alone

and in combination with the show-up, claiming that in both instances, there was undue suggestiveness. I agree with respondent that those are the only claims that have been exhausted for habeas review.

With regard to the court-ordered lineup, Corchado claims that it was flawed because "the stand-ins at the line-up did not even [sic] closely resemble petitioner's appearance" and "[t]he significant age discrepancy and difference of facial features between appellant and one of the fill-ins effectively created a four person line-up including petitioner." In addition, Corchado argues, his "facial features clearly set him apart from the other stand-ins which led to a substantial likelihood that he would be singled out." Corchado claims that the line-up and show-up considered together were suggestive because they

### 2.    Constitutionality of the Court-Ordered Line-Up

#### a.    The State Courts' Rulings

At the suppression hearing, the trial court held that there was no undue suggestiveness in the line-up procedure, specifically finding that "[t]he photographs of the lineup show that the participants are sufficiently similar in age, weight and body type. While they are not 'nearly identical' in appearance, that is not required." R.400. Accordingly, the trial court held that identification testimony gleaned from the line-up procedure was admissible at trial. *Id.*

On direct appeal, Corchado attacked the validity of the line-up on several grounds: First, he contended that he was considerably younger than one of the fillers, but considerably older than the other fillers. In response, the prosecution argued that petitioner did not stand out based upon his apparent age. Citing the line-up photos, the prosecution noted that each participant, including petitioner, appeared to be "in his twenties," R.22, matching the description given by

the eyewitnesses immediately after the shooting. Second, Corchado asserted that he stood out from the fill-ins based on his "facial features," although he did not identify which these were. The prosecution responded that there was no proof at the *Wade* hearing that the witnesses ever gave the police a description of petitioner's face, *see* R.22-23, and that the line-up photos contained five individuals who were similar in appearance. Third, Corchado contended that he effectively was subjected to a four-person line-up, not a five-person line-up, because one of the fillers, who was thirty-one years-old, was chronologically older than the remaining individuals. The prosecution argued that there was no *per se* rule in New York regarding the numerical composition of lineups. *See People v. Norris*, 122 A.D.2d 82, 84 (App. Div. 2d Dept.), *leave denied*, 68 N.Y.2d 916 (N.Y. 1986).

> The Appellate Division affirmed the trial court's decision, ruling as follows:

> Photographs of the two lineups establish that the subjects were of similar age, height and build, and had similar skin color and facial characteristics. The minor differences in the ages and physical characteristics of defendant and the others in the lineup were 'not sufficient to create a substantial likelihood that the defendant would be singled out for identification.'"

*People v. Corchado*, 299 A.D.2d 843, 844 (App. Div. 4th Dept. 2002) (quotation omitted).

### b. Federal Law Regarding Admissibility of Identification Testimony

Due process requires that criminal trials "proceed consistently with 'that fundamental fairness' which is 'essential to the very concept of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.1998) (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)). "When the prosecution offers testimony from an eyewitness to identify the defendant as a perpetrator of the offense, fundamental fairness requires that that identification testimony be reliable." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). Where a witness has made a pretrial identification, a

challenge to that identification and to an in-court identification of the defendant at trial triggers "a one-step or two-step inquiry." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir.1990); *see also*, *e.g.*, *Raheem*, 257 F.3d at 133.

The first step is to determine whether the pretrial identification procedures were unnecessarily suggestive which requires asking if it created "a very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). If the procedures were not unduly suggestive, then reliability of the identification testimony is a question that goes to the jury. *E.g.*, *Foster v. California*, 394 U.S. 440, 442 n. 2 (1969); *accord Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir.1986). If, however, the procedures are found to be unnecessarily suggestive, the second step is to determine whether the identification testimony is nevertheless admissible because it is "independently reliable rather than the product of the earlier suggestive procedures." *Maldonado-Rivera*, 922 F.2d at 973; *see also Raheem*, 257 F.3d at 133. In sum, "the identification evidence will be admissible if (a) the procedures were not suggestive or (b) the identification has independent reliability." *Id.*

It is well-settled that there is no requirement that all line-up participants be identical in appearance. *Roldan v. Artuz*, 78 F. Supp.2d 260, 271 (S.D.N.Y.1999) (gathering cases). When a lineup contains participants having varied appearances, the Second Circuit has instructed that "the 'principal question' in determining suggestiveness is whether the appearance 'of the accused, matching descriptions given by the witness,'" so stood out from the other participants as to suggest to the witness that the suspect was the culprit. *United States v. Wong*, 40 F.3d 1347, 1359-60 (2d Cir.1994) (quoting *Jarrett v. Headley*, 802 F.2d at 41). For instance, the Supreme Court has held that a lineup that unnecessarily contrasts the height of the suspect with that of the

19

other participants can be suggestive. *Foster v. California*, 394 U.S. at 441-44 (line-up unduly

suggestive where defendant placed with two other men who were six inches shorter).

In other words, "[a] lineup is unduly suggestive as to a given defendant if *he* meets the

description of the perpetrator previously given by the witness and the *other* lineup participants

obviously do not." *Raheem v. Kelly*, 257 F.3d at134 (emphases added); *accord United States v.*

*Maldonado-Rivera*, 922 F.2d at 973. Thus, the focus of the reviewing court's inquiry is not

whether the suspect has a distinctive feature not shared by the other participants, but whether

that feature matches the description provided by the witness. *Raheem*, 257 F.3d at 134; *accord*

*West v. Greiner*, No. 01 CV 1267(JG), 2004 WL 315247, at * (E.D.N.Y. Feb. 12, 2004) (state

court's finding that a lineup at which murder defendant was identified was not impermissibly

suggestive was reasonable, thus precluding federal habeas relief, despite petitioner's claim that

he was the only participant who had gray hair; the description of the suspect given to the police

was of a man between the ages of 50 and 60 years-old, but did not describe gray hair, and at least

two of the fillers, though they did not have gray hair, appeared to be approximately the same age

as the defendant).[4] Where one witness has emphasized a particular characteristic of the

perpetrator in giving a description to the police, a line-up in which only the defendant has that

---

[4]     *See also Raheem*, 257 F.3d at 134, 137 (lineup unduly suggestive where "the most prominent
feature . . . mentioned by [witnesses] in their descriptions to the police was the shooter's black leather coat," and
petitioner was the only one wearing such a coat during the lineup); *United States v. Eltayib*, 88 F.3d 157, 166 (2d
Cir.1996) (photo array unduly suggestive where witness had described perpetrator as having "a head full of hair, real
bushy hair, afro-type hair," and defendant's photo was the only one showing a full head of hair, and the other photos
pictured subjects with darker skin than defendant); *Holmes v. Artus*, No. 03Civ.7065(LAP)(GWG), 2005 WL
1027195, at *12-14, 17 (S.D.N.Y. May 4, 2005) (finding lineup unduly suggestive where many witnesses had
described petitioner as having light complexion and stocky build, and petitioner was the only one fitting this
description in lineup); *United States v. Perez*, 248 F. Supp.2d 111, 113-14 (D. Conn. 2003) (finding photo array
suggestive where witness repeatedly referred to petitioner's "dark complexion," and all other photos were of men
with "markedly lighter faces," and witness had indicated that skin color was a "distinguishing referent" in his
examination of another photo array).

characteristic may well taint the identification of the defendant only by that viewer. *Raheem*, 257

F.3d at 134 (citing *United States v. William*, 469 F.2d 540, 546 (D.C.Cir.1972)). It is for this

reason that "a lineup may be suggestive to one viewer even though it is not to another." *Id.*

In this case, the Appellate Division found as a fact that the lineup participants were of

similar age, height and build, and had similar skin color and facial characteristics.  In habeas

proceedings, a state court's factual findings are entitled to a presumption of correctness which

the petitioner bears the burden of overcoming by "clear and convincing" evidence. *See* 28 U.S.C.

§ 2254(e)(1). This Court has reviewed the copies of the photographs of the line-up procedure,

*see* Respondent's Exhibit ("Resp't Ex.") B, and agrees with the Appellate Division's conclusion

that any differences were so minor as to be insufficient to create a substantial likelihood that

petitioner would be singled out for identification. It is this Court's independent opinion that

Corchado did not stand out from the other lineup participants based upon a distinctive facial

feature that matched the description given by any of the witnesses.  Furthermore, as the

Appellate Division found, the witnesses' description of the perpetrator of the shooting did not

contain a reference to the shooter having distinctive facial feature also possessed by Corchado.

*Compare Solomon v. Smith*, 645 F.2d 1179, 1182-84 (2d Cir. 1981) (lineup suggestive where

suspect is only person meeting height and weight descriptions provided by witness), and *United

States ex rel. Cannon v. Montanye*, 486 F.2d 263, 266-67 (2d Cir. 1973) (lineup suggestive

where defendant directed to wear green sweater and witness had stated suspect wore green shirt),

*with United States v. Jacobetz*, 955 F.2d 786, 803 (2d Cir. 1992) (lineup not suggestive despite

fact that suspect had smallest mustache where witness had described suspect as having no facial

hair at all). Furthermore, all of participants were dressed identically in jumpsuits, obviating any

21

possibility that the witnesses would identify Corchado based on the clothing he had been wearing at the time of the incident. *See Israel v. Odom*, 521 F.2d 1370, 1374 (7th Cir.1975) ("Lineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification."). Thus, I cannot find that the Appellate Division's analysis rejecting Corchado's challenge to the suggestiveness of the lineup was erroneous as a matter of state or federal constitutional law. By definition then, the Appellate Division's conclusion was not unreasonable in light of clearly established Supreme Court precedent, and habeas relief is foreclosed.

### 3.     Combined Suggestiveness of the Line-up and Show-up

I turn next to Corchado's challenge to the combined suggestiveness of the line-up and the show-up procedures. He argues that because the eyewitnesses (the victim's friends) were not able to make an identification at the show-up held immediately after the incident at the hospital, then their ability to identify petitioner at the subsequent line-up identification must have been based upon their recollection of the show-up rather than their observations during the shooting. Thus, Corchado is not arguing that the show-up procedure standing alone was unduly suggestive; rather, he is complaining that the very fact of there being two identification procedures resulted in undue suggestiveness and tainted the witnesses' identifications during the latter procedure.

A defendant's right to due process of law includes the right not to be the object of suggestive police identification procedures that create a "substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198 (1972); *Simmons v. United States*, 390 U.S. 377, 384 (1968). The Second Circuit has observed that "[t]his protection must encompass

not only the right to avoid improper police methods that suggest the initial identification, but as well the right to avoid having suggestive methods transform a selection that was only tentative into one that is positively certain." *Solomon v. Smith*, 645 F.2d at 1185.  "[W]hile a witness is always entitled to become surer of an identification, due process precludes the generation of that increased certainty through a suggestive lineup or a prolonged one-on-one viewing not preceded by a proper lineup. *Id.* (citing *Simmons v. United States*, 390 U.S. at 383; *United States v. Wade*, 388 U.S. at 240-41).

Suggestiveness has been found when the police repeatedly present a particular suspect in successive procedures until an identification is made. *See Foster v. California*, 394 U.S. at 443. In *Foster*, the defendant was placed in an initial lineup where his clothing and height were distinctive from the other members of the lineup. In particular, "petitioner stood out from the other two men by the contrast of his height and by the fact that he was wearing a leather jacket similar to that worn by the robber." *Id.* at 442. When this first line-up did not lead to a positive identification, the police permitted a one-to-one confrontation between petitioner and the witness. *Id.* Even after this procedure, "the witness' identification of petitioner was tentative" so about a week to ten days later another lineup was arranged. In the second line-up, which consisted of five individuals, petitioner was the only person present who had also participated in the first lineup. *Id.* at 443. After this third procedure, the witness was "convinced" that petitioner Foster was the culprit. *Id.* at 441-42; *see also id.* at 443. The Supreme Court found that the procedures used by the police in *Foster* "made it all but inevitable" that the witness would eventually make a positive identification of the defendant. *Id.* at 443.

I believe that the present case is distinguishable from *Foster*, however, on several bases.

23

First,  the show-up and the line-up procedure, standing alone, were not unnecessarily suggestive. The Court has discussed *supra* in this Decision and Order why the line-up procedure was not impermissibly suggestive.

Although the "practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302 (1967) (quoted in *Foster v. California*,  394 U.S. at 442-43), prompt, on-the-scene show-ups such as the one in Corchado's case have been held constitutionally acceptable. *E.g.*, *United States v. Bautista*, 23 F.3d 726, 729 (2d Cir. 1994). The circumstances presented here made the show-up procedure a necessity:  Within minutes of the shooting, the victim arrived at the hospital, and the witnesses gave a description of the shooter, which was broadcast over the police radio. When the police apprehended Corchado minutes later in an area not far from the shooting, prompt identification of him was necessary to ensure that the officers had found the correct individual before the trail had grown cold. Since the alternative of a formal line up would have required transporting petitioner to the precinct and securing the presence of an appropriate number of "fillers" who had characteristics similar to him, it would necessarily have taken hours to arrange. In such circumstances, "prompt confrontation [is] desirable because it serve[s] to insure 'the immediate release of an innocent suspect and at the same time [to] enable the police to resume the search for the fleeing culprit while the trail is still fresh.'" *United States ex rel. Cummings v. Zelker*, 455 F.2d 714, 716 (2d Cir.), *cert. denied*, 406 U.S. 927 (1972) (quoting *United States v. Sanchez*, 422 F.2d 1198, 1200 (2d Cir. 1970)). Accordingly, the Second Circuit has explained, "it is now settled law that prompt on-the-scene confrontation is 'consistent with good police work' and does not offend the principles established in *United States v. Wade*."

24

*Zelker*, 455 F.2d at 716 (citing, *inter alia*, *Sanchez*, 422 F.2d at 1200). The fact that the show-up occurred within thirty minutes of the shooting and in reasonably close proximity to the scene of the crime favors a finding that the procedure was not unduly suggestive and was, instead, the product of effective police work. *See Francischelli v. Potter*, 03-CV-6091 (ENV), 2007 WL 776760 at *6 (E.D.N.Y. Mar. 12, 2007) ("The show-up identification's advantages are most pronounced when it takes place in close temporal and geographic proximity to the crime."). Finally, I note that the police officer who conducted the show-up took care to instruct that Corchado not be in handcuffs while he was viewed by the witnesses. *See United States v. Bautista*, 23 F.3d at 730 ("The fact that the suspects were handcuffed, in the custody of law enforcement officers, and illuminated by flashlights also did not render the pre-trial identification procedure unnecessarily suggestive. In this case, handcuffs, custody, and flashlights were all necessary incidents of an on-the-scene identification immediately following a night-time narcotics raid."). I note that the record contains no evidence that Lieutenant Doyle, while speaking with the witnesses, made any statements to them that suggested that the individual apprehended was in fact the perpetrator. *See Simmons v. United States*, 390 U.S. at 385.

After reviewing the entire record, I must conclude that Corchado's case is readily distinguishable from the circumstances presented in *Foster*. The salient differences are noted again: In *Foster*, the one-on-one confrontation occurred immediately after the first line-up procedure, at the police station, when the witness asked if he could see the defendant alone. The show-up in *Foster* was not the type of  prompt, on-the-scene procedure that occurred in Corchado's case and that has been found to be consistent with good police work. Next, as noted

25

above, the first line-up shown to the accused in *Foster* was inherently suggestive; it had only had

two fillers, plus the defendant, who was markedly taller than the two fillers, by about half a foot,

and who was wearing a leather coat similar to the one that the perpetrator had been observed to

be wearing. In Corchado's case all of the fillers *appeared* to be about the same age, height, and

weight as petitioner, despite some variation in their chronological ages and actual weights. And,

unlike the first line-up in *Foster*, at Corchado's line-up, he was not wearing the articles of

clothing he had been wearing on the night of the incident and which had figured prominently in

the witnesses' description of the shooter. Rather, Corchado was dressed in an identical fashion as

the four other fillers in the line-up.  Further distinguishing this case from *Foster* is the fact that

Corchado was *not* the only individual who appeared in both of the line-ups.

There is no constitutional prohibition against the police conducting more than one

identification procedure in a given case. As the Second Circuit explained, "a witness is always

entitled to become surer of an identification . . . ." What "due process precludes [is] the

generation of that increased certainty through a suggestive lineup or a prolonged one-on-one

viewing not preceded by a proper lineup." *Solomon v. Smith*, 645 F.2d at 1185  (citing *Simmons

v. United States*, 390 U.S. at 383; *United States v. Wade*, 388 U.S. at 240-41). In Corchado's

case, neither identification procedure was constitutionally marred by suggestive police practices.

The trial court did note that while the ability of the witnesses to identify Corchado in the line-up

five months after an unsuccessful show-up "raise[d] questions," those could be explored by

defense counsel in his cross-examination of the identifying witnesses. This was a correct

statement of the Supreme Court's teachings on this subject: "Absent a violation of procedural

rights accorded to [petitioner] by the Constitution, 'the reliability of properly admitted

eyewitness identification, like the credibility of the other parts of the prosecutor's case is a matter for the jury.'" *Saltys v. Adams*, 5 F.2d 1023, (2d Cir. 1972) (quoting *Foster v. California*, 394 U.S. at 442 n. 2) *accord Watkins v. Sowders*, 449 U.S. 341, 349 (1981) (explaining that cross-examination is the "time-honored process" for testing the reliability of the identifying witness and his or her identification of the suspect). Given the circumstances presented here, I must conclude that the state courts did not violate Corchado's due process rights in permitting a second identification procedure in the form of a line-up following the initial, unsuccessful show-up. *See id.*

### 4.   Denial of Opportunity to Call Witnesses at the *Wade* Hearing

Finally, Corchado claims that his Sixth and Fourteenth Amendment rights were violated because the state court did not permit him to call witnesses at the *Wade* hearing. Under the Constitution, the right to call witnesses is a trial right. *People v. Chipp*, 75 N.Y.2d 327, 335 (N.Y.), 498 U.S. 833 (1990); *People v. Peterkin*, 75 N.Y.2d 988 (N.Y. 1990). In *People v. Chipp*, 75 N.Y.2d at 337, the New York Court of Appeals held that a defendant does not have "an absolute right to compulsory process" at a *Wade* hearing. The *Chipp* court noted that the defendant had offered "no persuasive authority for the proposition that an absolute right to compulsory process attaches to a *Wade* hearing." Rather, "as at trial, any right of compulsory process at a *Wade* hearing may be outweighed by countervailing policy concerns, properly within the discretion and control of the hearing Judge." *Id.* Affording defendants an absolute right to compulsory process at a *Wade* hearing "would enable defendants to harass identifying witnesses and to transform the hearing into a discovery proceeding neither authorized nor contemplated by the Legislature." *Id.* at 337. Therefore, "'absent some indication that the

pre-trial identification procedure employed was suggestive, a hearing judge may properly preclude a defendant from demanding the appearance and testimony of a witness at the *Wade* hearing.'" *Duran v. Miller*, 322 F. Supp.2d 251, 257 (E.D.N.Y. 2004) (quoting *Rivalta v. Artuz*, No. 96 Civ. 8043(SAS), 1997 WL 401819 at *3 (S.D.N.Y. July 16, 1997)).

In light of the New York court of appeals' analysis and holding in *People v. Chipp*, federal habeas courts in this Circuit have concluded that the denial of the defense request to call witnesses at a *Wade* hearing does not deprive a petitioner of a federal constitutional right or address a matter of clearly established federal law as required for habeas review. *E.g.*, *Duran v. Miller*, 322 F. Supp.2d at 257; *Rivalta*, 1997 WL 401819, at *3; *Sorenson v. Superintendent*, No. 97 Civ. 3498(NG), 1998 WL 474149, at *4 (E.D.N.Y. Aug.7, 1998) ("Generally, the discretionary exclusion of an identifying witness by a trial judge at a pre-trial hearing does not rise to the level of constitutional error.")). *See generally Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas corpus relief does not lie for mere errors of state law). This Court agrees. Accordingly, the Court denies this claim in that Corchado has failed to raise an issue of federal constitutional dimension.

### B.      Violation of the Sixth Amendment's Confrontation Clause

Corchado asserts that the trial court erred by permitting a police officer to testify about the contents of a radio transmission–specifically, a physical description given by the witnesses to responding police officer Chauncey White, which served as the basis for Officer White to stop petitioner on the street. The record reveals that defense counsel objected to the testimony solely on hearsay grounds, and did not specifically reference his client's confrontation clause rights:

>  The Prosecutor:      What description do you recall hearing over the radio?
>  Defense Counsel:    Objection, Your Honor.

| The Court: | Well, . . . this is hearsay information coming out over the car radio. I understand that. The description is the product, presumably of either one or more than one witness at the hospital. Its accuracy must be attributed to its declarant. This officer doesn't know its accuracy. He only knows what he hears. So it's hearsay, unless we know upon what it was based and who gave it. So it's kind of hearsay but we're going to allow it and to establish why he did as he did as to give motivation as to what he did. But you must look to the declarant, the ultimate declarant or the description to determine the accuracy or lack of it. Do you [the jury] follow all that, do you think? Okay. |
| | Hearsay is what you hear from somebody whose [sic] not around to tell you the accuracy or not around to test the accuracy of the declarant. Here he doesn't know who gave the description. He only knows that he heard it. Having heard it, he did certain things and we'll take that. Go ahead." |
| The Prosecutor: | What description do you recall hearing over the radio? |
| Officer White: | Light-skinned black male with a hat on, black and white checkered short-sleeved shirt, blue – jeans shorts. |
| The Prosecutor: | Do you recall anything else? |
| Officer White: | He was carrying a back pack, a Jansport back pack. |

R.712-15.  The trial court thus admitted Officer White's statement recounting the perpetrator's

description a New York state law exception to the hearsay rule for statements offered not for

their truth but to complete a narrative. *Id.* Corchado argues now that this exception is

unconstitutional because it violates the Sixth Amendment's Confrontation Clause.

Respondent argues that this claim has not been exhausted because it was presented to the

trial court and to the appellate court on direct appeal only in terms of a violation of New York

state's rules against hearsay evidence, and there was no citation to the Sixth Amendment's

Confrontation Clause or any other federal constitutional provisions or case law. I agree that

respondent's argument regarding the failure to exhaust is persuasive.

The Second Circuit has explained that "[a] defendant may . . . fairly present the substance

of a federal constitutional claim to the state court without citing """book and verse on the federal constitution.""" *Daye v. Attorney General of New York*, 696 F.2d 186, 192 (2d Cir. 1982) (*en banc*) (quoting *Picard v. Connor*, 404 U.S. 270, 278 (1971) (quoting *Daugharty v. Gladden*, 257 F.2d 750, 758 (9th Cir.1958)). Essentially, what the habeas petitioner must do is to ensure "that in state court the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Id.* This may be accomplished by "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Id.* at 194.

In Corchado's case, trial counsel's objection at trial was based solely on hearsay grounds. Furthermore, it is clear, based on the limiting instruction given, the trial judge only interpreted the objection in terms of the rules against hearsay.[5] The Second Circuit "adhere[s] to the principle that, as a general matter, a hearsay objection by itself does not automatically preserve a Confrontation Clause claim." *United States v. Dukagjini*, 326 F.3d 45, 60 (2d Cir. 2003) (citing *Daye*, 696 F.2d at 193; *United States v. LaHue*, 261 F.3d 993, 1009 (10th Cir. 2001), *cert. denied*, 534 U.S. 1083 (2002) (trial counsel had raised hearsay objection, but "[w]here a Confrontation Clause objection is not explicitly made below we will not address the constitutional issue in the absence of a conclusion that it was plain error for the district court to fail to raise [it] *sua sponte*") (quoting *United States v. Perez*, 989 F.2d 1574, 1582 (10th Cir.1993) (*en banc*)); *Greer*

---

[5]     New York takes a "stringent" approach to the contemporaneous objection rule, *People v. Jones*, 81 A.D.2d 22, 440 N.Y.S.2d 248, 260 (App. Div. 2d Dept. 1981). A claim may be considered on appeal only if the objection made at trial was "sufficiently specific to focus attention upon the particular issue sought to be raised on appeal." *Id.* at 258.

*v. Mitchell*, 264 F.3d 663, 689 (6th Cir. 2001) (rejecting defendant's argument that "trial court's ruling on hearsay objections were significant enough to implicate the Confrontation Clause"); *see also Barber v. Scully*, 557 F. Supp. 1292, 1294 (S.D.N.Y. 1983) (rejecting contention that an objection on grounds of hearsay is "sufficiently specific to focus attention" upon a confrontation clause claim; explaining that "[w]hile there is substantial overlap between the evidentiary rules of hearsay and the constitutional right of confrontation, the two doctrines are not identical. *See Ohio v. Roberts*, 448 U.S. 56, 66 (1980).  In the press of trial, it is by no means clear that a hearsay objection will alert the trial court to the problems of the Confrontation Clause."). Thus, as these cases illustrate, a hearsay objection or claim does not automatically "call to mind" the Sixth Amendment's Confrontation Clause. To the contrary, in *Daye*, the Second Circuit observed that "a defendant's claim that he was deprived of a fair trial because of the admission in evidence of a statement objectionable as hearsay would not put the court on notice that the defendant claimed a violation of his constitutional right to be confronted by his accusers." As the Second Circuit later pointed out, *Daye* presented that "hearsay scenario as an example of a situation in which a state prisoner seeking federal habeas relief would have *failed* to exhaust his state remedies for a confrontation clause violation." *Dukagjini*, 326 F.2d at 60 n.10 (emphasis supplied).

Corchado's appellate state court brief similarly failed to alert the state courts to the alleged federal nature of his claim. Then, in his appellate brief, the point heading of the argument section did not include a reference to any specific constitutional amendments, or even the rights

to due process and a fundamentally fair trial.[6] Rather, he stated merely, "The [trial] court erred when it allowed impermissible hearsay during trial." In the argument section itself, Corchado cited only New York state court decisions and treatises on evidence. He did not cite any federal cases interpreting federal constitutional law or state cases employing a constitutional analysis. Nor is the fact pattern presented by Corchado's claim "well within the mainstream" of constitutional litigation. It is, instead, a garden-variety hearsay issue.

Finally, to the extent that Corchado claims improper "bolstering" of the identification testimony as a result of Officer White's statement that petitioner matched the description of the suspect, that argument is also unexhausted. *See Grady v. LeFevre*, 846 F.2d 862, 865 (2d Cir. 1988) ("Appellant totally fails to explain how this 'bolstering' claim was thought to have alerted the state courts to the idea that appellant was asserting a federal confrontation clause claim. This 'bolstering' claim simply did not assert the claim 'in terms so particular as to call to mind' a specific constitutional right-i.e., the right protected by the confrontation clause. We hold that appellant did not satisfy the exhaustion requirement with regard to [the] claim [of bolstering].").

For all of the foregoing reasons, I conclude that Corchado did not fairly present his hearsay claim in federal constitutional terms to the state court. Therefore, his claim regarding Officer White's testimony is not exhausted. "'[F]or exhaustion purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred."'" *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir.1997)

---

[6]     In any event, the Second Circuit has found vague references to the deprivation of "constitutional rights" or a "fair trial" or "due process" in a defendant's appellate brief do not suffice to exhaust the claim in state court. *See, e.g., Grady v. LeFevre*, 846 F.2d at 864 (making one reference to "constitutional rights" in petitioner's brief is insufficient to provide adequate notice to the state courts to a confrontation clause issue); *Petrucelli v. Coombe*, 735 F.2d 684, 687 (2d Cir. 1984) (asserting general fair trial and due process claims in state courts do not exhaust a double jeopardy claim).

(quoting *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir.1991) (quoting *Harris v. Reed*, 489 U.S. 255, 263 n. 9 (1989))).  "In such a case, a petitioner no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)." *Grey v. Hoke*, 933 F.2d at 120. Here, it is clear that Corchado is now barred from raising his Confrontation Clause claim in a collateral motion to vacate the judgment in state court because it could have been raised on direct appeal, but was not.  *See* N.Y. CRIM. PROC. LAW § 440.10(2)(c) (mandating that the trial court deny any issue raised in a C.P.L. § 440.10 motion where the defendant unjustifiably failed to argue such violation on direct appeal despite a sufficient record."). And, Corchado can no longer seek leave to appeal his conviction directly to the New York Court of Appeals, since he has used the one direct appeal to which he is entitled under New York law.  *See* N.Y. COURT RULES § 500.10(a). Thus, Corchado has no further recourse in state court. *See* 28 U.S.C. § 2254(c); *Grey v. Hoke*, 933 F.2d at 120-21; *Reyes v. Keane*, 118 F.3d at 139.

These procedural bars that cause the Court to deem the claim exhausted also render it procedurally defaulted.. *E.g.*, *Reyes v. Keane*, 118 F.3d at 139; *Bossett v. Walker*, 41 F.3d at 828; *Washington v. James*, 996 F.2d 1442, 1446-47 (2d Cir.1993), *cert. denied*, 510 U.S. 1078 (1994); *Grey v. Hoke*, 933 F.2d at 120-21.  "[T]o avoid [such] a procedural default, a habeas petitioner must " 'demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice," ' i.e., a showing of 'actual innocence.'" Corchado  has not attempted to show cause and prejudice or "actual innocence". The Confrontation Clause claim, therefore, shall be denied as procedurally barred.

## C.    Fourth Amendment Violations

Corchado raises a number of claims attacking the validity of the search warrant issued regarding his clothing and arguing that his Fourth Amendment right to be free from unreasonable searches and seizures was violated. However, the Supreme Court has concluded that Fourth Amendment claims are barred from federal habeas review under *Stone v. Powell*, 428 U.S. 465 (1976), if "the State has provided an opportunity for full and fair litigation" of them. *Id.* at 494. The Second Circuit has interpreted *Stone v. Powell* to permit habeas review of Fourth Amendment claims in only two rare situations: "(a) if the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir.1992).

I note that Corchado has not addressed *Stone v. Powell* in his habeas pleadings. The Court has nevertheless examined the record to determine if Corchado's case qualifies for an exception to the general rule precluding review of Fourth Amendment claim on federal habeas. It does not.

With regard to subsection (a) of the test enunciated by the Second Circuit in *Capellan*, there can be no serious dispute that New York State provides sufficient avenues through which Fourth Amendment claims may be raised and remedied. In fact, the "federal courts have [on prior occasions] approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. CRIM. PROC. LAW § 710.10 et seq. . . . , as being facially adequate." *Capellan*, 975 F.2d at 70 n. 1 (quoting *Holmes v.. Scully*, 706 F.Supp. 195, 201 (E.D.N.Y.1989); citing *Gates v. Henderson*, 568 F.2d 830, 837 & n. 4 (2d Cir.1977), *Shaw v. Scully*, 654 F. Supp. 859,

864 (S.D.N.Y.1987)). Pursuant to that statutory provision, the defendant in a criminal case may move to suppress evidence prior to, or in some cases, during trial. *Gates*, 568 F.2d at 837. As the Second Circuit concluded in *Gates*, the issue whether New York State provides adequate procedures for litigating Fourth Amendment claims "cannot be open to serious challenge." *Id.*

Turning then to subsection (b) of the Second Circuit test for determining whether a Fourth Amendment claim escapes the *Stone v. Powell* bar, Corchado must demonstrate that an "unconscionable breakdown" in the State's corrective measures occurred because the state courts "failed to conduct a reasoned method of inquiry into relevant questions of fact and law." *Capellan,* 975 F.2d at 71 (internal quotation marks omitted). Corchado does not and cannot dispute that he had a full suppression hearing conducted before the trial court. Then, after trial, Corchado litigated his Fourth Amendment claims on direct appeal. Notably, all that the Constitution requires is that Williams was provided with an *opportunity* to litigate his Fourth Amendment claims–it matters not whether he actually took advantage of that opportunity by raising the claims in a motion to suppress before the state court. *See Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002) ("[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief. . . . [T]he bar to federal habeas review of Fourth Amendment claims is permanent and incurable absent a showing that the state failed to provide a full and fair opportunity to litigate the claim[.]").

It is apparent that Corchado is merely attempting to re-litigate his Fourth Amendment claims before this Court because he disagrees with the state court's factual findings, which the

Second Circuit has explicitly stated does not amount to an "unconscionable breakdown" so as justify an exception to *Stone v. Powell*. *See Capellan v. Reilly*, 975 F.2d at 71 ("Even if Capellan were correct in his allegation that the Appellate Division erroneously decided this issue, a petitioner cannot gain federal review of a fourth amendment claim simply because the federal court may have reached a different result.") (citing *Gates v. Henderson*, 568 F.2d at 840 ("*Stone v. Powell* . . . holds that we have no authority to review the state record  and grant the writ simply because we disagree with the result reached by the state courts."). All Corchado seeks to do is have this Court conduct a *de novo* factual review of his Fourth Amendment claims, which the Supreme Court and the Second Circuit have explicitly held is precluded on collateral federal review of a state court conviction. Accordingly, this claim is dismissed.

## IV.   Conclusion

For the foregoing reasons, petitioner Marcus R. Corchado's petition for a writ of habeas corpus is denied. Because Corchado has not made a substantial showing of the denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c).

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: September 19, 2008
       Buffalo, New York.